IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
DAVID CATRINO            *
                         *
v.                       *
                         *   Civil Action No. WMN-09-505
TOWN OF OCEAN CITY       *
                         *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**MEMORANDUM**

Before the Court is Defendant's Motion for Summary Judgment. ECF No. 47. The motion is fully briefed. Upon a review of the papers filed and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion should be denied.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff David Catrino is an individual with diabetes who was formerly employed by Defendant Town of Ocean City as a patrol officer in the Ocean City Police Department (OCPD). Plaintiff filed this action on March 3, 2009, asserting claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (ADA). The precise nature of Plaintiff's ADA claims, however, has drifted somewhat over time. In the original Complaint, Plaintiff asserted that he was denied a reasonable accommodation for his diabetes and that he was wrongfully discharged from his position because of his diabetes. After Defendant filed a motion to dismiss, Plaintiff amended his

Complaint to assert that he was constructively discharged from his position.  Concluding that the facts alleged in the Amended Complaint could not support a constructive discharge claim, the Court issued a memorandum and order dismissing the Amended Complaint.  ECF Nos. 18 & 19.

Plaintiff timely moved for reconsideration, arguing that he erred in using the term "constructive discharge" and acknowledged that the constructive discharge line of cases that he cited in opposing Defendant's motion was inapplicable to his claims.  ECF No. 20 at 1.  The Court granted Plaintiff's motion, finding that the allegations in the Complaint adequately stated a failure to accommodate claim under the ADA as well as a wrongful discharge claim under the ADA.  ECF No. 23 at 3-4.

Discovery has now been completed and Defendant has moved for summary judgment.  Although Defendant acknowledges that Plaintiff has asserted both a failure to accommodate and a wrongful discharge claim under the ADA, see ECF No. 47 at 2 n.2, Defendant confined its briefing almost exclusively to Plaintiff's wrongful discharge claim.  Following Defendant's lead, Plaintiff only briefed wrongful discharge.  While the two claims are certainly closely related, they are two distinct theories under which plaintiffs can proceed under the ADA and the Court will treat them as such.  See Rhoads v. F.D.I.C, 257

F.3d 373, 387 n.11 (4th Cir 2001) (setting out the elements of both claims).

The facts relevant to Plaintiff's claims are as follows. Plaintiff began his employment with Defendant in 1994. In February of 2007, Plaintiff informed Defendant that he had been diagnosed with Type II diabetes and requested that, as an accommodation for his diabetes, he be permitted to take regular meals during non-emergency situations. Plaintiff acknowledges that Defendant accommodated this request without exception until July 21, 2007.

Plaintiff reported for duty on that date, a Saturday, at about 7:15 a.m. He testified that he felt ill during roll call but went on patrol nonetheless. He handled quite a few calls in the morning and early afternoon and at around 2:00 p.m. he turned over an arrest to another OCPD officer because he had yet to eat and was feeling ill. He proceeded to a restaurant and ordered lunch but, before it could be served, Plaintiff received a call from his supervisor, Corporal Albert Custer, who ordered him to report to the City's Public Safety Building (PSB). Plaintiff explained that he needed to eat and requested that the meeting be postponed, but Custer directed him to abandon his meal and report to the PSB immediately.

Plaintiff reported to the PSB where he met with Sergeant Raymond Austin and Lieutenant Richard Currence. Austin served

3

Plaintiff with disciplinary papers related to an incident that had occurred in April 2007 in which Plaintiff had engaged in an exchange of profanity with another officer. After this brief meeting at the PSB, Plaintiff was ordered by Custer to report immediately to the Route 50 Bridge where Custer was directing traffic. Plaintiff did so and arrived at the bridge at about 2:30 p.m.

Plaintiff's and Defendant's versions of the events of July 21 are largely in agreement up until the time that Plaintiff arrived at the Route 50 Bridge. At this point, they begin to diverge. Plaintiff testified that, when he arrived at the bridge, he pulled up to Custer and rolled down the window of his police cruiser. After telling Custer the reason he was called to the PSB and expressing his frustration with the investigation, he opined that he "ought to just quit." Pl.'s Dep. at 61. He also expressed his displeasure that he was not permitted to eat his lunch and he told Custer that he was not feeling well and needed to eat right away and go to see his doctor.

Plaintiff testified that Custer replied, "OK, OK, OK," but asked that Plaintiff first handle a police call regarding a possible wanted suspect on the bridge. Plaintiff handled that call and, believing that Custer had given him permission to leave his shift after running the check on the suspect, drove

4

back to the police substation, dropped off his police cruiser, and picked up his personal vehicle. He then called "10-42" on his radio, which is the police code for "end of tour of duty" and turned off his radio. At this time, there were approximately two hours left on Plaintiff's shift.

Plaintiff then drove toward his doctor's office. Plaintiff's cell phone was receiving an intermittent signal but when he did receive a signal he called his doctor's office, only to discover that it was not open. He then started driving to his home, stopping to eat at a fast food restaurant on the way. When he again received a signal on his cell phone, he called his wife to tell her he was not feeling well and was heading home.

Custer relates a different version of the conversation with Plaintiff at the foot of the Route 50 Bridge. Custer testified most recently[1] that Plaintiff was "very, very, mad" at being called to the PSB and said that he "quit." Custer Dep. at 24-27. When he heard Plaintiff call in 10-42, Custer immediately got on the radio and told the police communications office to disregard Plaintiff's 10-42. He also radioed Plaintiff to come see him. When Custer did not hear back from Plaintiff, he became worried and directed OCPD Officer Tarek Dagstani to go to Plaintiff's home to look for him, authorizing the use of lights

---

[1] Other witnesses testified that, on the day of the incident, Custer told them that Plaintiff simply said he "ought to just quit." See, e.g., Richard Currence Dep. at 23.

5

and sirens to enable him to get there as quickly as possible. Custer was also about to issue an alert to all officers in the area to look for Plaintiff's vehicle when he was able to contact Plaintiff's wife and learned that he was on his way home. Custer then drove to Plaintiff's house and found him there. Custer observed that Plaintiff was "pale white" and "just didn't look good." Id. at 34.

The next day that Plaintiff was scheduled to work was Tuesday, July 24, 2007. At 5:00 p.m. on Monday, July 23, 2007, Plaintiff received a telephone call from Captain Kevin Kirstein informing Plaintiff that his "resignation" had been "accepted." Plaintiff protested that he had never resigned. Shortly thereafter, Plaintiff received a letter dated July 24, 2007, from the Chief of the OCPD, Bernadette DiPino, indicating that Plaintiff's employment with the City was terminated on July 21, 2007, pursuant to Section 6.8 of the Employee Handbook. That Section provides, "an employee who verbally quits and walks off the job will be seen to have voluntarily terminated." Dipino related in the letter that it had come to her attention that Plaintiff informed his immediate supervisor, Custer, that he was "quitting [his] job and leaving [his] post." Pl.'s Ex. 10. As explained more fully below, Plaintiff contends that DiPino's invocation of the Employee Handbook provision was simply a pretext to terminate Plaintiff's employment.

**II. SUMMARY JUDGMENT STANDARD**

Summary judgment is only proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this requirement, the burden shifts to the nonmoving party to prove there is a genuine issue for trial and that evidence exists to prove the elements of the party's substantive law claims. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. 317, 321 (1986); Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

**III. DISCUSSION**

As noted above, Plaintiff brings both a failure to accommodate claim and a wrongful discharge claim under the ADA.

7

As the Court noted in its previous memorandum, ECF No. 23 at 3-4, to establish a failure to accommodate claim, a plaintiff must prove: (1) that he was an individual with a disability within the meaning of the ADA; (2) that the employer had notice of his disability; (3) that with reasonable accommodation, he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations. Rhoads, 257 F.3d at 387 n. 11. Here, Plaintiff asserts that Defendant's refusal to allow him time to eat in a non-emergency situation was a refusal to make a reasonable accommodation for his diabetes.

Defendant makes no argument that Plaintiff is not an individual with a disability within the meaning of the ADA.[2] In addition, there is more than ample evidence that Plaintiff's superiors, including Custer, were aware that Plaintiff was a

---

[2] The Court is somewhat surprised that the parties have not engaged in any discussion of the issue of whether Plaintiff is an individual with a qualified disability. While diabetes can constitute a disability under the ADA, it is not always found to be. See Kline v. Home Depot, Inc., Civ. No. RDB-08-990, 2009 WL 2246656 (D. Md. July 27, 2009) (observing that, "to arrive at the disability determination, courts engage in a highly fact-dependent and case-specific analysis of a diabetic's condition after mitigating measures, such as insulin, are taken into account"). Because Defendant has not challenged this element of Plaintiff's claim, the Court will assume for the purposes of this motion that Plaintiff has a disability within the scope of the ADA.

diabetic.  Furthermore, Defendant makes no claim that Plaintiff was unable to perform the essential functions of his position.

While Defendant makes no argument directly addressing Plaintiff's failure to accommodate claim, the Court can assume it would rely on Custer's testimony that when he spoke with Plaintiff at the foot of the bridge Plaintiff did not tell him that he felt ill and needed to eat and see his doctor.  See Custer Dep. at 22-24.  If Plaintiff did not ask for that accommodation, obviously that request could not have been refused.  Plaintiff, however, insists that, "I told [Custer] that I was not feeling well.  I told him I needed to see my doctor.  I told him I needed to eat immediately."  Pl.'s Dep. at 63.  Thus, whether on July 21, 2007, Plaintiff requested this accommodation is a question about which there is a material dispute of fact and Defendant is not entitled to summary judgment on Plaintiff's failure to accommodate claim.[3]

As to Plaintiff's wrongful termination claim, Plaintiff has no direct evidence that Defendant terminated him because of his diabetes.  Therefore, to prove his claim, he must rely on the now familiar McDonnell Douglas[4] burden-shifting framework employed by federal courts in discrimination cases.  See Ennis

---

[3] Plaintiff concedes that this is the only occasion on which Defendant refused to accommodate his diabetes.  This single refusal, however, obviously had very serious repercussions.

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

9

v. Nat. Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-58 (4th Cir. 1995) (holding that the McDonnell Douglas scheme of proof applies to appropriate claims under the ADA). Under that framework, the plaintiff has the initial burden of proving a prima facie case of discrimination. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets that burden of production, the plaintiff must show that the proffered reason for the employment decision was pretextual. Id. at 58.

To establish a prima facie case of wrongful termination under the ADA, Plaintiff must demonstrate that: (1) he was in the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. Haulbrook v. Michelin North America, 252 F.3d 696, 702 (4th Cir. 2001). There has been no dispute raised here as to the first three elements of the prima facie case. As to the fourth element, the Court finds that Plaintiff is able to meet his burden as to this element as well. If Plaintiff's testimony is believed, on July 21, 2007, he asked

for and was granted permission to leave his shift a few hours early so that he could address a diabetes-related emergency. Two days later, he was terminated. The Court also notes that after having served on the force for more than a dozen years, Plaintiff was terminated less than six months after his employer learned of his diabetes.

Defendant offers its reliance on Section 6.8 of the Employee Handbook as a legitimate, non-discriminatory reason for Plaintiff's termination. A trier of fact, however, could easily conclude from the evidence that this reason was pretextual. First, there is evidence that, immediately after the conversation at the bridge, Custer told other OCPD personnel that Plaintiff said he "ought to quit." See supra n.1. Furthermore, it is hard to imagine that Custer reasonable concluded that Plaintiff had quit his job in anger but then proceeded to follow Custer's instruction and to respond to a call regarding the possible suspect on the bridge. Custer's urgent efforts to locate Plaintiff in hours after the conversation at the bridge are also as consistent, if not more consistent, with a belief on the part of Custer that Plaintiff was endangered by a diabetic episode[5] than with the belief that he had simply walked off the job.

---

[5] In April of 2007, Plaintiff passed out at his home as the result of extremely low blood sugar. When he failed to appear

In addition, on the evening of July 21, 2007, Custer had a conversation with Sergeant Bunting of the OCPD and Bunting testified that, based on that conversation, he did not believe that Plaintiff had quit his job. Bunting Dep. at 19. After speaking with Custer, Bunting filled out a time sheet for Plaintiff indicating that he had worked seven hours and took three hours of personal leave. Id. at 18. Based on all this evidence, a trier of fact could easily conclude that, by the end of the day on July 21, 2007, no one in the OCPD, including Custer, believed that Plaintiff had expressed an intent to quit his job after thirteen years on the police force.

A finder of fact could also conclude, based on the evidence, that the decision to treat Plaintiff as though he had resigned was made two days later by Chief DiPino. Corporal Bernal testified that he heard that Captain Kirstein came to Chief DiPino with a copy of Section 6.8 of the Employee Handbook and stated, "If you want him, we've got him." Bernal Dep. at 32.[6] Bernal opined that relying on Section 6.8 was "just an easy way for them to get rid of [Plaintiff]." Id. at 31.

---

at roll call, Corporal Bernal of the OCPD went to his house, was able to wake him and get him to eat.

[6] It is not clear from the deposition transcript whether Bernal actually heard Kirstein say this, or if he heard this secondhand. If secondhand, there would be hearsay problems with this evidence.

12

While denying that the reason given for terminating Plaintiff's employment was pretextual, Defendant in its Reply actually provides evidence confirming that DiPino seized upon the July 21 incident as an opportunity to get Plaintiff off of the OCPD force. In arguing that DiPino terminated Plaintiff for reasons other than his diabetes, Defendant cites testimony of various OCPD personnel to the effect that DiPino did not like Plaintiff. ECF No. 53 at 7-8. Dagstani testified that "[Plaintiff] wasn't very popular. I don't think that they were disappointed to see a situation transpire that they might be able to try to get rid of [Plaintiff]." Dagstani Dep. at 39-40. Corporal McIntyre testified similarly that Plaintiff's relationship with DiPino was very tenuous and that she would jump on the first opportunity to act against Plaintiff. McIntyre Dep. at 29.[7]

Thus, the Court finds that Plaintiff could establish a prima facie case of wrongful discharge and pretext. It remains a question, however, if this is sufficient to get Plaintiff to the jury on this claim. In Reeves v. Sanderson Plumbing Prods., the Supreme Court addressed the issue "as to whether a plaintiff's prima facie case of discrimination, . . . combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision,

---

[7] While characterizing DiPino as opportunistic in this regard, McIntyre also testified that she would not "make anything up or contrive anything." Id.

13

is adequate to sustain a finding of liability for intentional discrimination." 530 U.S. 133, 140 (2000). As the Fourth Circuit explained:

> The Reeves Court recognized that its decision in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993), taught that "the fact-finder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff." Reeves, 120 S.Ct. at 2108 (emphasis added). The Court clarified, however, that it is "permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Id. Thus, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 2109. In so holding, the Supreme Court invalidated the requirement that "a plaintiff must always introduce additional, independent evidence of discrimination" to survive summary judgment. Id.
>
> Put another way, in Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not automatically create a jury question, but it may do so. Even when a plaintiff demonstrates a prima facie case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if "no rational factfinder could conclude that the action was discriminatory." Id. But, absent such evidence, courts may not require a plaintiff who proves both a prima facie case and pretext to produce additional proof of discrimination in order to survive a defendant's motion for summary judgment. This is so because "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Id. at 2108.

Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

14

Here, beyond the prima facie case and pretext, Plaintiff presents little to support a finding of discrimination on the basis of his diabetes.  Plaintiff admits that, prior to July 21, 2007, Defendant fully accommodated his disability.  Defendant has also submitted evidence that there are others in the OCPD who are diabetic and have been fully accommodated.  Bernal Dep. at 12, 51 (testifying that he was never mistreated as a diabetic); Dagstani Dep. at 22-23 (testifying that another OCPD patrol officer supervised by Custer has diabetes and has been accommodated).  This cuts against a finding of discrimination on the basis of this disability.  In addition, from the evidence submitted by Defendant with its Reply, it would appear that, while DiPino may have jumped on the opportunity to get rid of Plaintiff, it was for reasons other than his medical condition.

Although perhaps a close call, the Court will deny Defendant's motion as to the wrongful discharge claim as well. Under Reeves, Plaintiff is not required to produce additional proof of discrimination beyond establishing the prima facie case and pretext.  In allowing this claim to go forward, the Court is also mindful that it was not until it filed its Reply that Defendant suggested that its reliance on Section 6.8 may have been a pretext for something other than to hide discriminatory conduct.  As such, Plaintiff did not have the opportunity to respond to these new arguments.

Accordingly, Defendant's motion will be denied. A separate order will issue.

                              _____/s/_____
                              William M. Nickerson
                              Senior United States District Judge

DATED: August 15, 2011